Errol **GOLDMAN, Trustee of the Michigan Carpenters' Council Apprenticeship and Training Fund Trust, Jeff Simkiss, David Belmore, Gregg Hamm, Jamie Mayrand, Mike Brady, Rick Van Bonn and Washtenaw Contractors Association, Inc., Plaintiffs,**

v.

The **MICHIGAN CARPENTERS' COUNCIL APPRENTICESHIP AND TRAINING FUND TRUST and the Trustees of the Trust, Excluding Plaintiff, Being Jack Ramage, Ron Adams, Jack Stanton, Barbara Strachan, Terrance Auman, Gerald Neumann, Bill Bielas, Charles Bucher, William Fair, Neil Kositzky and David Stark, jointly and severally, Defendants.**

No. 91–CV–73175.

United States District Court,
E.D. Michigan, S.D.

Jan. 8, 1992.

Harvey W. Berman, Ann Arbor, Mich., for plaintiffs.

Edward Freeberg, Plainwell, Mich., for defendants.

## OPINION AND ORDER DENYING IN PART PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

ROSEN, District Judge.

### INTRODUCTION

This matter is before the Court on the parties' cross-motions for summary judgment. The Complaint in this action charges that the trustees of a carpenter apprenticeship trust fund violated the provisions of that trust fund. The parties agree that this action arises under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, because the trust fund pursuant to which the Plaintiffs bring suit fits within the definition of an "employee welfare benefit plan" or "welfare plan" under 29 U.S.C. § 1002(1).

The parties' briefs address a number of different issues. However, pursuant to a status conference held by this Court on October 28, 1991, the parties agreed that they would initially submit to this Court one issue to decide: whether the trustees of the trust fund have the authority to suspend the operation of the Washtenaw apprenticeship training program. According to the parties, the Court's decision on this issue will facilitate the resolution of the remainder of the Plaintiffs' claims. Oral argument was heard by the Court on December 9, 1991.

### FACTS

The following facts are relevant to the issue presently before the Court. On December 1, 1966, the Michigan State Carpenters' Council and the Michigan Chapter of the Associated General Contractors of America, Inc. executed a document entitled "Michigan Carpenters' Council and Training Fund Agreement and Declaration of Trust" ("Trust Agreement"). The Trust Agreement created the Defendant Michigan Carpenters' Council Apprenticeship and Training Fund Trust ("Trust Fund")

for the purpose of defraying the cost of apprenticeship training:

The Trust Fund is created, established, and maintained and the Trustees agree to receive the Trust Fund and to hold and administer it for the purpose of defraying training costs, as provided for in the Apprenticeship Training Program.

Article II, Section 2.[1]

The Trust Agreement establishes twelve trustees ("Trustees"), six representing the unions and six representing employers, to administer the Trust Fund.[2] These Trustees are to distribute Trust Fund money to the joint apprenticeship training committees participating in the Trust Fund upon receipt of a written request for funds. The decision whether to distribute funds and the amount of funds to be distributed rests with the Trustees.[3] The Trustees may also use the Trust Fund money to pay reasonable administrative costs, taxes, and to purchase, sell, or otherwise convey real property in furtherance of the objectives of the apprenticeship training programs.[4] The Trust Agreement lists a number of specific powers granted to the Trustees to enable them to accomplish the purpose of the Trust Fund. These include the authority to require contributions from employers, establish an administrative structure for the Trust Fund, make rules regulating the Trust Fund, and invest Trust Fund money.[5] The signatories to the Trust Agreement— but not the Trustees—have the power to amend the document with certain limitations, including that an amendment may not be inconsistent with the provisions of applicable collective bargaining agreements.[6] The Trust Agreement also has a

---

1. Apparently the system works as follows. There are two trust funds in the State of Michigan—the Detroit fund and the outstate fund— designed to facilitate the operation of training programs throughout the state. The subject fund is the outstate fund. Pursuant to collective bargaining agreements, employers contribute a set amount of money to a fund to be used to sponsor apprenticeship training. This money is not directed at a specific fund, however it must be placed in some trust fund for use in training apprentices.

There are seven training sites under the outstate program. These seven sites train apprentices from a number of different employers and unions. The sites are supervised by joint apprenticeship training committees which monitor the daily operation of the program. These committees request operating funds from the trustees in writing. The trustees then decide whether to grant the request for funds.

2. The original number of Trustees was six. The Trust Agreement was later amended to provide for twelve members.

3. Article II, Section 2 says:

Payments from the Fund for such purposes shall be made only for such charges as may be approved in writing by the Trustees upon written application of the Joint Apprenticeship Training Committee of a participating District Council, which may include, but not by way of limitation, charges for the following:

a) School supplies, equipment and instruction,

b) Graduation functions,

c) Clerical salaries,

d) Telephone and Telegraph,

e) Professional fees,

f) Travel expenses to special apprenticeship meetings

g) Insurance costs,

h) Rental costs.

4. Article II, Section 2 (Amendment, December 17, 1974) says:

The Trustees shall have the power and authority to use and apply the Trust Fund for the purpose of leasing, purchasing, mortgaging, selling, conveying, exchanging for other property or otherwise dealing in real estate or real property, upon such terms and at such times as they shall deem proper and in furtherance of the objectives of the Apprenticeship Training Program.

5. Article V, Section 1 says:

The administration of the Trust Fund shall be vested wholly in the Trustees, and for such administration, the Trustees, consistent with the purposes of this Trust Fund, shall have the power and authority to:

a) Require immediate contributions to the Trust Fund by Employers in accordance with applicable collective bargaining agreements....

b) [Hire individuals to perform administrative services.]

c) Make such uniform rules and regulations as are consistent with and necessary for effectuating the provisions of this Agreement and Declaration of Trust.

d) [Deposit or invest such money.]

e) Administer the Trust Fund in conformity with this Agreement and Declaration of Trust as from time to time amended, and in conformity with all applicable laws.

6. Article VII says:

provision which delegates to the discretion of the Trustees any issue of Trust Fund administration not specifically covered in the Trust Agreement:

> Any question arising in connection with the administration of this Agreement and Declaration of Trust, not herein specifically provided for, shall be left to the sole discretion of the Trustees.

Article VI, Section 4.

According to the Plaintiffs, the Washtenaw County Apprenticeship Training Program ("Washtenaw Program") has been in existence since 1947. Its daily operations are supervised by the Washtenaw County Joint Apprenticeship Training Committee ("Washtenaw Committee") which consists of an equal number of union and employer representatives. The Washtenaw Committee was originally established pursuant to a collective bargaining agreement and continues in existence pursuant to the Washtenaw Collective Bargaining Agreement ("WCBA").[7]

At their June 20, 1991 meeting, the Trustees adopted a motion suspending the operation of the Washtenaw Program.[8] Eleven Trustees supported the motion with Plaintiff Goldman dissenting.

According to the Defendants, the financial difficulties of the Washtenaw Program had been a matter of concern to the Trustees for some time prior to the adoption of this motion. Previously, at the April 4, 1991 Trustee meeting, a motion by Plaintiff Goldman requesting renewal of the lease for the Washtenaw Program's training site at $3301.33 per month failed to carry. At that point in the meeting, one Trustee observed that the Trust Fund was in financial difficulty and that the withdrawals from the Trust Fund of the Washtenaw Program had consistently exceeded its contributions. This Trustee then recommended that an ad hoc committee be appointed to study the situation and formulate recommendations to correct the deficit and consider the matter of renewing the lease for the Washtenaw Program; this motion carried. Another Trustee subsequently remarked that major structural changes in the operation of the Trust Fund, including the consolidation of training facilities, might become necessary. According to one Trustee who participated in the May 13, 1991 ad hoc meeting, the possibility of moving the Washtenaw Program to the Mason School was discussed as a method of cost containment.

Based upon these facts, the parties make the following arguments: Plaintiffs contend that the Trust Agreement does not authorize the Trustees to suspend the operations of the Washtenaw Program; Defendants counter that this suspension is fully within the power of the Trustees as set forth in the Trust Agreement.

## DISCUSSION

■ The issue before the Court is whether the Trustees had the authority to suspend operations of the Washtenaw Program. The parties agree that section 1104(a)(1)(D) of ERISA is the appropriate starting point for an analysis of this issue. That section reads:

---

This Agreement and Declaration of Trust may be amended in any respect from time to time by written agreement between the Union and the Association, except that no amendment shall divert the Trust Fund as constituted immediately prior thereto or any part thereof to a purpose other than as set forth herein, nor shall there be any amendments which will eliminate the requirement of an annual audit, provide for the Fund to be held in trust with other than by an equal number of Union Trustees and Employer Trustees, or be inconsistent with the provisions of applicable collective bargaining agreements.

7. Article XVII, Section 1 provides as follows:
   Each EMPLOYER agrees to pay into the Joint Apprenticeship Fund for each hour

worked by all Employees covered by this Agreement in accordance with the provisions as incorporated in the wage schedule.

8. The minutes of the meeting state as follows:
   a MOTION was made by Mr. Stark and supported by Mr. Bucher that training of apprentices in Ann Arbor be suspended from June 30, 1991, to September 30, 1991, and the apprentices be offered the option of attending apprentice classes at the facility in Mason with the understanding that the Ann Arbor Instructors would be utilized in this endeavor and that Mr. Reynolds advise the party from whom the facilities are leased that the lease would not be renewed. Motion carried with Mr. Goldman dissenting.

(1) Subject to sections 1103(c) and (d), 1342, and 1344 of this title, a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

\* \* \* \* \* \*

(D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter or subchapter III of this chapter.

29 U.S.C. § 1104(a)(1)(D).[9] The parties further agree that, at a minimum, the document governing the plan is the Trust Agreement.[10] Therefore, in accordance with § 1104(a)(1)(D), the Court must interpret the Trust Agreement to determine whether it grants the Trustees the authority to suspend the operations of an apprenticeship program.

## I. Relationship of Trust Agreement and Collective Bargaining Agreements

■ The premise, and central point, of the Plaintiffs' argument is that the Trust Fund "is created pursuant to, and is subject to, various collective bargaining agreements ("CBAs") between local unions and the employers that bargained with those unions." Therefore, the Trust Agreement is limited by the provisions of these various CBAs: "Plaintiffs assert that the Trust Agreement expresses a clear intention that its terms be subject to the collective bargaining agreements which are served by the Trust." As support for this proposition, the Plaintiffs refer to several provisions of the Trust Agreement. The preamble provides:

\* \* \* \* \* \*

WHEREAS, *certain Local Unions of the Union have in effect certain collective bargaining agreements* which provide, among other things, for the establishment of a fund intended to defray costs, as provided in the Joint Apprenticeship Training Program in which the parties participate; and

WHEREAS, *by virtue of said collective bargaining agreement [sic]*, employers are obligated to make contributions which are to be held in such a fund and used to accomplish the aforesaid purposes;

WHEREAS, it is desired by the parties to establish and maintain a Trust Fund to accomplish the aforesaid purposes;

NOW, THEREFORE, in consideration of the premises and *in order to establish and provide for the maintenance of the aforesaid Trust Fund, \* \* \* it is mutually understood and agreed as follows:*

\* \* \* \* \* \*

Trust Agreement at 1 (emphasis added).

The Plaintiffs cite other references to CBAs in the Trust Agreement. In Article I, Section 2, the Trust Agreement defines employer as "any employer engaged in work coming within the jurisdiction of the Union who is obligated, *by a collective bargaining agreement*, to make contributions to the Trust Fund" (emphasis added). In Article V, Section 1(a), the Trustees are endowed with the power to "[r]equire immediate contributions to the Trust by Employers *in accordance with applicable collective bargaining agreements*" (emphasis added). Finally, the Trust Agreement provides at Article VII, titled "Amendments," that "... no amendment shall ... be incon-

---

**9.** Despite the apparent deferral of the statutory language to trust documents, a trust document may not contravene the policies of ERISA. In such a case, the policies underlying ERISA (which, in general, are the same as those underlying the common law of trusts), would preempt any contradictory language in a trust document. *Central States v. Central Transport, Inc.*, 472 U.S. 559, 105 S.Ct. 2833, 2839, 86 L.Ed.2d 447 (1985) ("... trust documents cannot excuse trustees from their duties under ERISA, and that trust documents must generally be construed in light of ERISA's policies"). However, neither party here claims that the language of

the Trust Agreement is contrary to the policies of ERISA. Rather, both parties appear to assume the validity of the Trust Agreement under ERISA and only dispute whether a particular action fits within the terms of the Trust Agreement.

**10.** As discussed below, the Plaintiffs claim that the Trust Agreement *and* applicable collective bargaining agreements govern the operation of the Trust Fund while the Defendants claim that *only* the Trust Agreement controls the Trust Fund.

sistent with the provisions of *applicable collective bargaining agreements*" (emphasis added).

Having established their premise, the Plaintiffs then demonstrate that the WCBA, the relevant CBA in this case, mandates that the Program not be located other than in Washtenaw County. They quote from Article XIV, Section 4 of the WCBA: "The Employer and the Union agree that neither party can unilaterally change the basic aspects of the Apprenticeship Program including but not limited to its Washtenaw County location."

Arguing that they have demonstrated that the Trust Agreement is subject to the WCBA and that the WCBA intended that the Program not leave Washtenaw County, the Plaintiffs wish the Court to conclude that the Trust Agreement does not permit the relocation of the Washtenaw Program outside of Washtenaw County, and therefore, the Trustees acted outside of the authority granted them under the Trust Agreement when they·suspended the operation of the Washtenaw Program and merged it with the Mason facility.

The problem with the Plaintiffs' argument is that the premise is unsound. The references to CBAs in the Trust Agreement do not indicate that the Trust Agreement is *subject to* the WCBA. The preamble simply states a fact—local unions have CBAs pursuant to which they contribute money to be held and used for training programs—and implies that the Trust Fund is being instituted to coalesce the various funds of the local union into one Trust Fund. There is absolutely no indication in the preamble that the funds thus collected in the Trust may only be disbursed in accordance with the provisions of each of the underlying CBAs.

Article I, Section 2 simply describes an employer as one who, among other things, is obligated by a CBA to make contributions to the Trust Fund. It does not indicate in any way that the Trust Agreement

is subject to the provisions of the WCBA. Similarly, Article V, Section 1 describes the manner in which the Trustees are able to collect contributions.[11] Again, this does not indicate that the Trustees are beholden to individual CBAs.

At oral argument, Plaintiffs' counsel stressed the importance of Article VII's provision on amendments. He analogized the amendment process to the Trustees' decision making process. According to counsel, the fact that no amendment to the Trust Agreement may be inconsistent with applicable CBAs indicates that a decision by a Trustee may not be inconsistent with the terms of an applicable CBA. If this were not the case, he stressed, then there would be no need for amendments because the Trustees could take whatever action they chose under Article VI, Section 4.

There are several difficulties with this argument. First, amendments to the Trust Agreement are made by the Union and the Association, signatories to the Trust Agreement, not by the Trustees. Therefore, Article VII does not, by its terms, limit the power of the Trustees.

Second, the fact that an amendment may not "be inconsistent with the provisions of applicable collective bargaining agreements" does not necessarily mean that the decisions of the Trustees, otherwise permitted by the Trust Agreement, are likewise circumscribed by the terms of applicable CBAs. Amendments and Trustee decisions are qualitatively distinct. Amendments generally involve major and permanent changes in the structure and operation of the Trust Fund as a whole. These changes affect every participant in the Trust Fund and, as *ex post facto* modifications, are not part of the document entered into by the Trust Fund participants. On the other hand, the Trustees' routine decisions are generally more case-specific and individualized. They are not permanent and do not involve sweeping changes in the administration of the Trust Fund. Accordingly,

**11.** Although a bit unclear, presumably this section refers to the specific *amount* that the employer must contribute. Employers contribute different amounts to the apprenticeship training fund. The amount required of each employer is specified in the CBA to which that employer is bound.

the Trustees are given greater flexibility to make such daily decisions so as to ensure the expeditious and effective fulfillment of their duties.

However, even assuming that the Plaintiffs are correct and the Trust Agreement cannot contravene a CBA, the instant CBA provision would not mandate the result desired by the Plaintiffs. That section provides that "[t]he *Employer* and the *Union* agree that neither party can unilaterally change the basic aspects of the Apprenticeship Program including but not limited to its Washtenaw County location" (emphasis added). Nothing in this clause indicates that the *Trustees* must maintain the Washtenaw Program in Washtenaw County. The Plaintiffs' response that this CBA provision indicates the spirit and intent of the WCBA not to permit the apprenticeship program to leave the area is insufficient to overcome the direct language of the Trust Agreement (*see infra*).

Finally, the Court notes the practical impossibility of the Plaintiffs' position. According to the Defendants' counsel, there are approximately 50 or 60 CBAs pursuant to which funds are contributed to the Trust Fund. If this Court were to accept the Plaintiffs' argument, the result would be that the Trustees could not make any decision that in any way contravened a provision found in any one of the 50 or 60 relevant CBAs. Clearly, such a system would be so unwieldy as to be impracticable and would prevent the Trustees from fulfilling their duties under ERISA and the Trust Agreement. As such, the Court rejects the Plaintiffs' interpretation of the Trust Agreement as being unsupported both by common sense and the language of the Trust Agreement.

## II. Terms of the Trust Fund

In determining the nature and extent of the Trustees' authority, the Court should look to the terms of the Trust Agreement. Restatement (Second) of Trusts § 164 (1959). The parties agree that the Trust does not explicitly permit or prohibit suspension of the operations of a training facility. Therefore, the most rele-

vant language of the Trust Agreement for the instant determination is Article VI, Section 4. That section reads as follows:

> Any question arising in connection with the administration of this Agreement and Declaration of Trust, not herein specifically provided for, shall be left to the sole discretion of the Trustees.

Any Trust Fund matter not covered by the Trust Agreement is to be decided as the Trustees deem appropriate. Thus, by the terms of the Trust Agreement, as the decision whether to suspend operations is not specifically provided for in the Trust Agreement, this decision is to be left to the sole discretion of the Trustees.

The Plaintiffs, in their response to the Defendants' motion, submit two arguments against this position. First, they claim that Article VI, Section 4 is necessarily limited to matters of money management and does not include non-financial decisions taken by the Trustees:

> Plaintiffs cannot overemphasize the point that the administration of the Trust is a *money management matter* within the scope of the governing documents. The Trustees have as much discretion as they need to make decisions that have to do with the management of money, but they cannot broaden this provision to read that they have any authority to make decisions about training program sites or other similar matters (emphasis in original).

Second, were that section to apply to non-financial matters, the decisions of the Trustees would have devastating effects on the operation of the joint apprenticeship programs: "It is frightening to think that, at some point, these same Trustees will attempt to use Article VI, § 4, to move into the arena of making decisions about training materials, instructors, subject matter, or any number of other substantive training issues."

If Plaintiffs interpret "money management matter" as referring only to the disbursement of money to area apprenticeship programs, then the terms of the Trust Fund prove them erroneous. Under the Trust Fund, the Trustees are charged with

collecting money from the employers and are authorized to demand such money and assess reasonable costs for delinquent payments. Article V, Section 1. The Trustees are also authorized to buy and sell real estate. Article II, Section 2. Therefore, by "money management matter," the Court must assume that the Plaintiffs refer to any aspect of the Trust Fund administration which involves the handling of money.[12]

If "money management matter" refers to the handling of money, then the suspension of operations of the Washtenaw program must also be considered a money management matter. In suspending the Washtenaw Program, the Trustees essentially decided to deny disbursement of Trust Fund money to the Washtenaw program so as to improve the viability of the Trust Fund as a whole. The Plaintiffs themselves admit that the effect of the Trustees' action was a complete denial of funds:

> While the Trustees may have the power to determine the level of funding for the Washtenaw County Apprenticeship Program, they do not have the power to totally refuse all requests. *This is the net effect of the Trustees' suspension of the Washtenaw County Apprenticeship Program, a refusal of all requests by the Washtenaw County Apprenticeship Program before they are even made* (emphasis added).

As the suspension of the program was thus a money matter, it must be considered a question fitting within the discretion of the Trustees, even under the criteria proposed by the Plaintiffs.

As for the Plaintiffs second point of contention with Article VI, Section 4, the Court is unwilling to ignore the plain meaning of a contract simply because, in the unsupported opinion of the Plaintiffs, an interpretation consistent with this plain meaning may lead to a situation in which the Trustees make decisions that the Plaintiffs believe are better delegated to the apprenticeship committees. The Plaintiffs have submitted no evidence that the Trustees are encroaching on the supervisory functions of the area committees. Absent such a showing, the Court cannot ignore the plain language of the Trust Agreement based on a hypothetical situation imagined by the Plaintiffs.[13]

In sum, the Court finds that the clear and unambiguous language of the Trust Agreement delegating to the Trustees all Trust Fund decisions not specifically provided for in the Trust Agreement controls the resolution of the instant issue. The Trustees thus operated within their authority when they decided to suspend the Program.

### III. *Scope of Trust*

Having found that the Trustees have the authority to suspend the Program under Article 4, Section 1, the Court concludes by addressing the Trust Agreement as a whole. The Trust Fund was created for the benefit of several joint apprenticeship programs in the State of Michigan. The Trustees have a fiduciary duty toward all the contributors to the Trust Fund. This system-wide duty requires that the Trustees defray training costs for all training programs participating in the Trust Fund. Therefore, any authority granted the Trustees by the Trust Agreement is authority to act on behalf of and in the interest of the participants *as a whole*. A review of the record, including the parties' briefs, minutes from two Trustee meetings, and statements made at oral argument indi-

---

12. In fact, Plaintiffs admit as much in their response to the Defendants' motion: "Defendants have not been able to point to anything in the trust document that give [sic] the Trustees the discretion to do anything other than make decisions about money handling and the funding of programs."

13. The Court can envision decisions by the Trustees which would arguably be without the power granted them under Article VI, Section 4. For example, a decision by the Trustees as to the appropriate apprentice training methods would arguably not be "in connection with" the administration of the Trust Agreement, and therefore would be outside the discretion of the Trustees. However, the Court finds that the instant question is clearly—and uniquely—a money matter and, as such, is delegated to the sole discretion of the Trustees.

cates that the Trustees suspended the operations of the Washtenaw Program for the purpose of improving the financial viability of the Trust Fund. Presumably, a failure to do so would have resulted in the dissolution of the fund or an increase in training costs. However, the purpose of the Trust Fund is to *reduce* training costs. In their pursuit to reduce these training costs, the Trustees are not beholden to any one apprenticeship training program. Rather, they must focus on the *collective* and *system-wide* well-being of the several participating programs.[14]

The Court believes that the appropriate remedy for a dissatisfied union is to withdraw from participation in the Trust Fund. Apparently, the Plaintiffs understand that they have the option to withdraw from the Trust Fund. They state in their brief: "While the Washtenaw Collective Bargaining Agreement in this case does not require that the employers pay their money specifically to the Michigan Carpenters' Council Apprenticeship and Training Fund, the parties to the Washtenaw Collective Bargaining Agreement have thus far chosen to do so over the years and the Trust has willingly accepted their money." In addition, at oral argument, counsel for the Plaintiffs admitted that withdrawal from the Trust Fund would be an option for the Washtenaw area participants.

Therefore, the Court holds that the Trustees had the power under the Trust Agreement to suspend the operations of the Washtenaw Program. Issues remaining for the Court to decide in this matter are the disposition of fund assets paid by the Washtenaw Program and equipment removed from the Washtenaw training site by the Trustees.

NOW, THEREFORE;

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the Plaintiffs' motion for summary judgment is DENIED IN PART and the Defendants' motion for summary judgment is GRANTED IN PART.

---

**14.** While the Court does not doubt that the move from the Washtenaw to the Mason training facility may be inconvenient for the Washtenaw area apprentices, the Court notes that, according to the Defendants, the apprentices have scheduled attendance times only two days per month, the first and second Saturday of each month. The Court further observes that while some of these apprentices may have to travel 50 or more miles to reach the new site, apprentices located in other parts of the state must travel as much as 150 miles to reach their program sites.